# UNITED STATES DISTRICT COURT
for the
District of New Mexico

FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO
FEB 07 2022

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Samsung Galaxy S10+ Cell Phone, Model SM-G975U, S/N R58M90FVGAD, IMEI 351751104454098

Case No. 22-MR-196

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See attachment A

located in the _____ District of ___New Mexico___, there is now concealed *(identify the person or describe the property to be seized)*:

See attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18 §922 (g)(1) | Felon in Possession of a Firearm and/or Ammunition |
| Title 18 §113 (a)(4) | Assault by striking, beating, or wounding |

The application is based on these facts:
See attached affidavit that was approved by AUSA Thomas Aliberti.

☑ Continued on the attached sheet.

☐ Delayed notice of ___ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Curtis Imming, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___Telephonically sworn and electronically signed___ *(specify reliable electronic means)*.

Date: February 7, 2022

*Judge's signature*

City and state: Farmington, New Mexico

B. Paul Briones, US Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| IN THE MATTER OF THE SEARCH OF A <br><br> Samsung Galaxy S10+ Cell Phone, Model SM-G975U, S/N R58M90FVGAD, IMEI 351751104454098 <br><br> CURRENTLY LOCATED AT FBI Albuquerque, Gallup Resident Agency, 3200 U.S. Rte 66, Gallup, New Mexico 87301. | Case No. 22-MR-196 <br><br> **Filed Under Seal** |
|---|---|

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Curtis Imming, a Special Agent with the Federal Bureau of Investigation, being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since July 2014. I am currently assigned to the Albuquerque Field Office, Gallup Resident Agency. My primary duties as a Special Agent with the FBI include investigating crimes occurring in Indian Country. I have gained experience in the conduct of such investigations through previous case investigations, formal training, and in consultation with law enforcement partners in local, state and federal law enforcement agencies. As a

Federal Agent, I am authorized to investigate violations of the laws of the United States and have authority to execute arrest and search warrants issued under the authority of the United States.

3. I have received on the job training from other experienced agents and law enforcement officers. My investigative training and experience includes, but is not limited to, conducting surveillance, interviewing subjects, writing affidavits for search and arrest warrants, collecting evidence and learning legal matters which includes the topics of fourth amendment searches. I have previously participated in child exploitation investigations and search warrants.

4. The following information contained in this affidavit is based on my training and experience, my personal participation in this investigation, and information provided to me by other law enforcement officials. Unless otherwise indicated, where I have referred to written or oral statements, I have summarized them in substance and in part, rather than verbatim. Not all of the facts of the investigation known to me are contained herein, only those necessary to establish probable cause to search the below-listed item pertaining to the captioned investigation. As will be shown below, there is probable cause to believe that evidence of violations of 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm and/or Ammunition and 113(a)(4), Assault by Striking, Beating, or Wounding, will be found on the device listed below and described in Attachment A.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5. The property to be searched consists of a Samsung Galaxy S10+ Cell Phone, as described in Attachment A (hereafter referred to as "The Device") and identified as follows:

1. Samsung Galaxy S10+ Cell Phone, Model SM-G975U, S/N R58M90FVGAD, IMEI 351751104454098 sealed in an FBI Evidence bag, Barcode E6842107

2

(evidence item 1B8). This Device is currently located in evidence at FBI Albuquerque, Gallup Resident Agency, 3200 U.S. Rte 66, Gallup, New Mexico 87301.

6. The applied-for warrant would authorize the forensic examination of The Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## RELEVANT STATUTES

7. This investigation concerns alleged violations of certain activities relating a Felon in Possession of a Firearm and/or Ammunition committed by PESHLAKAI and the Assault by Striking, Beating, or Wounding of JANE DOE 1 by PESHLAKAI, as outlined in Titles 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 113(a)(4).

    a. Title 18 U.S.C. § 922(g)(1) - Prohibits a person who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year; to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

    b. Title 18 U.S.C. § 113(a)(4) – Whoever, within the special maritime and territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows: Assault by striking, beating, or wounding, by a fine under this title or imprisonment for not more than 1 year, or both.

## TECHNICAL TERMS

8. Based on my training and experience, I use the following technical terms to convey the following meanings:

3

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images.

This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected

to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

  e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

9. Based on my training, experience, and research, I know that The Device has capabilities that allows it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**PROBABLE CAUSE**

10. On September 23, 2021, FBIAQ, GRA was contacted by Navajo Police Department (NPD) Criminal Investigator (CI) Samantha Yazzie regarding the reported assault of C.P. (Hereinafter referred to as JANE DOE 1), Year of Birth (YOB) 1977, and kidnapping of T.P.

6

(Hereinafter referred to as JANE DOE 2), YOB 2010, R.P. JR. (Hereinafter referred to as JOHN DOE 1), YOB 2013, C.P. (Hereinafter referred to as JOHN DOE 2), YOB 2015, and R.P. (Hereinafter referred to as JANE DOE 3), YOB 2019, by RUMALDO PESHLAKAI, YOB 1981. PESHLAKAI was JANE DOE 1's husband and JANE DOE 2, JOHN DOE 1, JOHN DOE 2, and JANE DOE 3 were PESHLAKAI's children. The incident took place around JANE DOE 1's residence, JANE DOE 1's mother's residence, and the surrounding area.

11. NPD report 01-21-029388 dated September 23, 2021 provided that in the early morning of September 23, 2021, NPD dispatch was called by a female, later identified as JANE DOE 1. JANE DOE 1 reported she was being hit by PESHLAKAI at her residence. JANE DOE 1 later reported PESHLAKAI took JANE DOE 1's maroon Chevrolet Tahoe next door to JANE DOE 1's mother's house where JANE DOE 2, JOHN DOE 1, and JOHN DOE 2 were staying. PESHLAKAI already had JANE DOE 3 because she stayed with PESHLAKAI and JANE DOE 1 that night. PESHLAKAI took JANE DOE 2, JOHN DOE 1, JOHN DOE 2, and JANE DOE 3 and left the area in the maroon Tahoe. An Amber Alert for JANE DOE 2, JOHN DOE 1, JOHN DOE 2, and JANE DOE 3 was sent out in New Mexico and Arizona.

12. Review of text messages received via emergency authorization revealed phone number (505) 879-4731 associated to PESHLAKAI texting a phone number associated to JANE DOE 1. Text messages received by JANE DOE 1 from PESHLAKAI stated; "You know what you can call the cops I don't care just remember I'm not going back to prison....." and "ou won't ever see any of us ever again. " Additional text messages from JANE DOE 1 to PESHLAKAI show her begging him to bring the kids back home.

13. JANE DOE 1 later provided to NPD that PESHLAKAI called her from his cell phone and told her he saw law enforcement at the house and that he was still in the area.

14. NPD pursued PESHLAKAI who, while driving the maroon Chevrolet Tahoe, fled with JANE DOE 2, JOHN DOE 1, JOHN DOE 2, and JANE DOE 3, into a wooded area south of the residence and parked the vehicle in a secluded location.

15. FBIAQ, GRA arrived on scene and, along with NPD, were not able to identify if PESHLAKAI and JANE DOE 2, JOHN DOE 1, JOHN DOE 2, and JANE DOE 3 were still in the Tahoe. NPD utilized drones to attempt to identify if PESHLAKAI and the JANE DOE 2, JOHN DOE 1, JOHN DOE 2, and JANE DOE 3 were still in the vehicle or in the area. Due to the darkness of the tint, only the front driver and passenger compartments were visible by the drone. There was no one occupying the front driver and passenger seats. The drone was able to identify footprints around the area of the vehicle.

16. Based off the above, FBIAQ, GRA, along with NPD Officers, moved to secure the vehicle to identify if there were any occupants in the back seats and rear compartment of the Tahoe. The search of the vehicle was negative; however, NPD identified an empty box of 9-millimeter ammunition on the floor of the front driver compartment along with a single 9-millimeter round. There was also what appeared to be a white powdery substance in a clear baggie located in the center console area. NPD seized the ammunition and white powdery substance as it was in plain view. NPD identified what appeared to be three to four sets of footprints, one large and multiple smaller looking to be that of children, walking away from the vehicle. After tracking the footprints for about 6 miles, FBIAQ, GRA and NPD Officers identified vehicle tracks leading up to an abandoned housing area where the footprints lead. It appeared a vehicle arrived and picked up PESHLAKAI and JANE DOE 2, JOHN DOE 1, JOHN DOE 2, and JANE DOE 3. At that time, the foot search was concluded, and a Command Post was set up at the NPD Window Rock Station.

17.     In the evening of September 23, 2021, NPD Dispatch received a call from an individual identified as D.S. (Hereinafter referred to as WITNESS 3) YOB 1988. WITNES 3 had received information that JANE DOE 2, JOHN DOE 1, JOHN DOE 2, and JANE DOE 3 were safe, but she refused to provide who gave her the information. Shortly after, PESHLAKAI contacted NPD Dispatch and spoke to FBIAQ, GRA.

18.     PESHLAKAI provided JANE DOE 2, JOHN DOE 1, JOHN DOE 2, and JANE DOE 3 were safe at his mother's house. PESHLAKAI's mother was G.P. (Hereinafter referred to as WITNESS 4), YOB 1949. PESHLAKAI was not at WITNESS 4's house at the time of the phone call and would not give his location or meet with FBIAQ, GRA agents that evening. PESHLAKAI would turn himself in during the morning of September 24, 2021. FBI AQ, GRA along with NPD Officers located JANE DOE 2, JOHN DOE 1, JOHN DOE 2, and JANE DOE 3 at WITNESS 4's house and they were rescued without incident.

19.     On September 24, 2021, PESHLAKAI was interviewed. After being advised of his rights, and waiving said rights, PESHLAKAI agreed to be interviewed. JANE DOE 1 arrived home in the early hours of September 23, 2021 and brought alcohol home with her. PESHLAKAI and JANE DOE 1 stayed up and drank together. At 5:30 a.m., PESHLAKAI woke up JANE DOE 2, JOHN DOE 1, JOHN DOE 2, and JANE DOE 3 to get ready to go to school. Around the same time PESHLAKAI and JANE DOE 1 got into an argument. PESHLAKAI didn't want to hear it and he was trying to be calm. JANE DOE 1 grabbed him, and he swung and "tagged her in the cheek." When he tried to step around her, she came at him and he head butted her and PESHLAKAI saw blood on JANE DOE 1. PESHLAKAI left in a maroon Chevrolet Tahoe taking JANE DOE 2, JOHN DOE 1, JOHN DOE 2, and JANE DOE 3 with him. PESHLAKAI saw the police and was panicked and didn't want to go back to jail so he "went off roading." PESHLAKAI

told the kids to stay in the vehicle, but they didn't want to, so they walked north and were picked up by an older male in a gray truck.

20.     PESHLAKAI and JANE DOE 2, JOHN DOE 1, JOHN DOE 2, and JANE DOE 3 were taken to WITNESS 4's house in Fort Defiance, Arizona by the older male in the gray truck. PESHLAKAI walked barefoot from the Tahoe to where he was picked up by the older male. PESHLAKAI was wearing Crocs when he walked from the Tahoe with JANE DOE 2, JOHN DOE 1, JOHN DOE 2, and JANE DOE 3.

21.     PESHLAKAI didn't know where the guns were. There was a 9-millimeter round in the Tahoe and it was JANE DOE 1's vehicle. PESHLAKAI's fingerprints were on the ammunition because he was moving it around the vehicle. The guns are not in the Tahoe. There was a box of ammunition in the vehicle and PESHLAKAI looked at it and "pulled it out." PESHLAKAI had taken pictures of the guns with his cell phone and taken a picture of an AR as well. PESHLAKAI knew JANE DOE 1 owned a 9-millimeter handgun and a .25 caliber handgun. Peshlakai said he used the cell phone described in Attachment A to take the pictures.

22.     PESHLAKAI's handprints may be on the guns because he had to move the guns from inside the Tahoe. He had to grab the 9-millimeter and hand it to JANE DOE 1 a few months ago. If the gun was in the Tahoe it would be in the center console. PESHLAKAI was a felon and couldn't handle guns or ammunition, however, he did shoot them in the past.

23.     Review of documents from the US District Court for the District of Arizona revealed that in 2002 PESHLAKAI was found guilty of 18 USC § 1153 and 113(a)(6), Crime on an Indian Reservation, Assault Resulting in Serious Bodily Injury, which is a Class C Felony Offense. Additionally, in 2006, PESHLAKAI was found guilty of 18 USC § 922(g)(1), Felon in

Possession of a Firearm, a Class C Felony Offense. Based off the above, PESHLAKAI is prohibited from handling firearms or ammunition.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

24. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

25. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crime described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

11

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

26. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

27. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users

the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, if a locked device is equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

28. Based on the foregoing, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe RUMALDO PESHLAKAI's fingers (including thumbs) to the fingerprint scanner of the Device; (2) hold the Device in front of RUMALDO PESHLAKAI's face and activate the facial recognition feature, for the purpose of attempting to unlock the Device in order to search its contents as authorized by this warrant.

14

29. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## REQUEST FOR SEALING

30. It is further respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because premature disclosure of the contents of this Affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

## CONCLUSION

31.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachments A to seek the items described in Attachment B.

32.     The affidavit has been reviewed by AUSA Thomas Aliberti.

Respectfully submitted,

_____
Curtis Imming
Special Agent
Federal Bureau of Investigation

Subscribed and sworn telephonically and signed electronically on <u>Feb. 7</u>, 2022

_____
B. PAUL BRIONES
UNITED STATES MAGISTRATE JUDGE

16

# ATTACHMENT A

The below is the property to be searched as described in paragraph 3 of the Affidavit:

1. Samsung Galaxy S10+ Cell Phone, Model SM-G975U, S/N R58M90FVGAD, IMEI 351751104454098 sealed in an FBI Evidence bag, Barcode E6842107 (evidence item 1B8). This Device is currently located in evidence at FBI Albuquerque, Gallup Resident Agency, 3200 U.S. Rte 66, Gallup, New Mexico 87301.

This warrant authorizes the forensic examination of the device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

1. All records and information on the Device described in Attachment A that relate to violations of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 113(a)(4) from January 1, 2021 to present to include:

   a. All visual depictions (including images, videos, negatives, still photos, video tapes, artists drawings, slides and any type of computer formatted file) which depict weapons or ammunition as defined in 18 U.S.C. § 922(g)(1);

   b. Correspondence pertaining to the possession of weapons or ammunition as defined in 18 U.S.C. § 922(g)(1);

   c. Correspondence related to the assault of JANE DOE 1.

   f. All evidence related to off-site storage of electronic data, such as cloud-based servers, including usernames, passwords, account information and access logs;

   g. Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

   h. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

   i. GPS location history

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.